UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BEVERLY ZEMAITIS,

       Plaintiff,                                      Hon. Ellen S. Carmody

v.

                                                    Case No. 1:12-cv-1390

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On April 10, 2013, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #11).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

1

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 46 years of age on her alleged disability onset date. (Tr. 135). She successfully completed high school and previously worked as a nursing assistant and street sweeper operator. (Tr. 36-37). Plaintiff applied for benefits on July 27, 2009, alleging that she had been disabled since May 22, 2008, due to a closed head injury. (Tr. 135-45, 166).

Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 78-130). On June 20, 2011, Plaintiff appeared before ALJ Donna Grit with testimony presented by Plaintiff and a vocational expert. (Tr. 46-77). In a written decision dated August 23, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 26-38). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-7). Plaintiff subsequently initiated this pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## **RELEVANT MEDICAL HISTORY**

On May 22, 2008, Plaintiff reported to the emergency room after being struck in the forehead by a "heavy pole" at work. (Tr. 273). Plaintiff reported that she went home and "rested for several hours" after which she began experiencing "pain in her lower neck and upper shoulder

3

area." (Tr. 273). Plaintiff exhibited tenderness "in the musculature bilaterally over the trapezius and in the rhomboid area," but otherwise the results of a physical examination were unremarkable. (Tr. 273). The results of a CT scan of Plaintiff's cervical spine were "normal." (Tr. 273). Two days later, Plaintiff participated in a CT examination of her head the results of which revealed "no CT evidence of an acute intracranial hemorrhage or acute calvarial fracture."[1] (Tr. 280). Plaintiff subsequently began participating in physical therapy. (Tr. 299-331).

On September 23, 2008, Plaintiff participated in an MRI examination of her right shoulder the results of which revealed: (1) moderate changes of supraspinatus tendinosis; (2) very mild tendinosis of the subscapularis tendon; (3) no evidence of rotator cuff tear; (4) degenerative hypertrophic change at the AC joint; and (5) mild/moderate glenohumeral osteoarthrosis. (Tr. 339-40). Plaintiff also participated in an MRI examination of her cervical spine the results of which revealed "degenerative change of the cervical spine with acquired canal and foraminal narrowing at both the C5-C6 and C6-C7 levels." (Tr. 340-41).

On January 29, 2009, Plaintiff was examined by Dr. Patrick Ronan. (Tr. 385-87). Plaintiff reported experiencing neck pain which radiated into her right shoulder. (Tr. 385). The results of an examination were "suggestive of shoulder impingement, tendinitis or bursitis." (Tr. 387). The examination "d[id] not suggest significant structural damage, such as a rotator cuff tear." (Tr. 387). The doctor further observed that "I do not see anything on examination to suspect a major component of cervical problems" as Plaintiff "does not have a radicular component, and neurologic examination is benign." (Tr. 387).

---

[1] The calvaria is the "roof" or "upper domelike portion" of the skull. *See* Calvaria, available at http://medical-dictionary.thefreedictionary.com/calvaria (last visited on March 21, 2014).

On May 27, 2009, Plaintiff was examined by Dr. Ronan. (Tr. 372). Plaintiff reported that she continues to experience "pain in the shoulder without radiation to the arm." (Tr. 372). An examination revealed the following:

> Shoulder motion is fairly well preserved with discomfort at end-range flexion more than abduction as she demonstrates the top of the shoulder. Impingement testing is mildly provocative. Crossed adduction is benign. She has good strength without pain with resisted rotation of the shoulder. There is no evidence of biceps tendinitis. Sensation, strength and reflexes are preserved in the upper limbs.

(Tr. 372). The doctor recommended to Plaintiff that she "return to therapy this time with more emphasis on conditioning." (Tr. 372).

On June 5, 2009, Plaintiff was examined by Dr. Min Zhu. (Tr. 344-46). Plaintiff reported that she had been experiencing for several months "trembling and shaking in both arms and hands." (Tr. 344). Plaintiff also reported experiencing "a dull, aching in her neck radiating down into her right shoulder." (Tr. 344). Plaintiff exhibited reduced range of motion in her right shoulder as well as a "very fine tremor in both hands when she outstretches both arms in front of her." (Tr. 345). The results of a physical and neurologic exam were otherwise unremarkable. (Tr. 345). The doctor concluded that Plaintiff "most likely" was experiencing "essential tremor"[2] for which medication was prescribed. (Tr. 346). The doctor also instructed Plaintiff to have certain lab work completed. (Tr. 346). Subsequent treatment notes indicate that Plaintiff "did not have the labs done" and "did not take [her medication] on a daily basis." (Tr. 343).

On June 13, 2009, Plaintiff reported to the emergency room complaining of "pain in

---

[2] Essential tremor is a "nervous system disorder (neurological disorder) that causes a rhythmic shaking. . .most often in [the] hands." *See* Essential tremor, available at http://www.mayoclinic.org/diseases-conditions/essential-tremor/basics/definition/con-20034509 (last visited on March 21, 2014).

5

her left foot" which she suffered when she "was out chasing a ball on her property." (Tr. 332). The results of an examination of Plaintiff's foot were unremarkable and x-rays of Plaintiff's foot revealed "no significant bone or joint abnormality." (Tr. 332-34). Plaintiff was diagnosed with a "left foot tendonitis strain." (Tr. 332).

On June 15, 2009, Plaintiff participated in an MRA/MRI examination of her brain the results of which revealed no evidence of abnormality. (Tr. 337-38).

Treatment notes dated July 1, 2009, indicate that Plaintiff "continues to have pain in the shoulder, which can spread into the arm, but nothing distal to the elbow." (Tr. 368). Dr. Ronan reported that Plaintiff was not experiencing "symptoms from the cervical spine" or a rotator cuff tear, but was instead experiencing bursitis or tendinitis. (Tr. 368). On July 23, 2009, Plaintiff participated in a consultive examination conducted by Dr. Benjamin Bruinsma. (Tr. 557-60). The results of this examination revealed that Plaintiff was experiencing rotator cuff tendinitis with "no lasting evidence of a traumatic brain injury." (Tr. 557-60).

On September 1, 2009, Plaintiff reported that her essential tremor was "not particularly bothersome to her." (Tr. 474). In light of such, as well as the fact that Plaintiff did not take the medication which Dr. Zhu prescribed, it was recommended that Plaintiff undergo no treatment for such. (Tr. 474).

On October 14, 2009, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "degenerative changes at C6-7 and C5-6." (Tr. 504). Plaintiff also participated in an MRI examination of her brain the results of which were "satisfactory." (Tr. 508).

On October 19, 2009, Plaintiff participated in a consultive examination conducted

by Julia Cunningham Petros, Ph.D. (Tr. 493-97). Plaintiff reported that she was unable to work due to the results of the aforementioned work injury. (Tr. 493). Plaintiff exhibited difficulty adjusting to "the loss of her job, the major changes in her life and her anxiety about taking care of her children." (Tr. 495). The results of a mental status examination were otherwise unremarkable. (Tr. 494-96). Plaintiff was diagnosed with depressive disorder, not otherwise specified, and her GAF score was rated as 60.[3] (Tr. 497).

On October 29, 2009, Plaintiff participated in consultive examination conducted by Dr. Samer Elfallal. (Tr. 499-501). Plaintiff exhibited "some muscle spasms in her paravertebral muscles with some mild limitations in her neck movement," but the results of a physical examination were otherwise unremarkable. (Tr. 500-01). The doctor concluded that Plaintiff was experiencing "status post closed head injury with some chronic neck pain." (Tr. 501). The doctor further observed, however, that Plaintiff "does not have any radiculopathy" and only "a very mild essential tremor on examination." (Tr. 501).

On December 1, 2009, Plaintiff reported that recent injection therapy resulted in a "substantial reduction" in her pain. (Tr. 632). Specifically, Plaintiff stated that "as far as pain goes it is a zero" and that "she hasn't had any pain, no headaches at all." (Tr. 632).

On December 8, 2009, Plaintiff participated in memory function testing the results of which revealed "no evidence of significant deficit in memory function." (Tr. 523-26).

On December 14, 2009, Plaintiff participated in an EMG examination the results of which revealed "moderate" bilateral carpal tunnel syndrome, but "no evidence of cervical

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

radiculopathy or myelopathy." (Tr. 568-69). On December 23, 2009, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "limited spondylosis at C6-7 and at C5-6" and "narrowing of C7 and C6 foramina." (Tr. 570).

On December 31, 2009, Plaintiff underwent left carpal tunnel release surgery. (Tr. 629). On September 30, 2010, Plaintiff underwent right carpal tunnel release surgery. (Tr. 625). Treatment notes dated January 14, 2011, indicate that Plaintiff "no longer has numbness in [her] hands." (Tr. 647).

On January 27, 2011, Plaintiff participated in an MRI examination of her brain the results of which were "stable...without evidence for acute intracranial process." (Tr. 639).

On May 23, 2011, Dr. Lemke provided a statement concerning Plaintiff's impairments. (Tr. 656-58). The doctor reported that Plaintiff "is totally unable" to work "eight hours a day, five days a week, week after week." (Tr. 656). The doctor reiterated that he did not believe Plaintiff "could ever work a full eight hour shift" because she "would have difficulty with even that much activity." (Tr. 657). The doctor reported that Plaintiff required a job that afforded her a sit/stand option. (Tr. 657).

On June 2, 2011, Dr. Lemke reported that Plaintiff could "occasionally" lift/carry less than 10 pounds, but could "never" lift/carry 10 pounds or more. (Tr. 662). The doctor also reported that Plaintiff could stand and or walk for "less than 2 hours in an 8-hour workday." (Tr. 662). The doctor also reported that Plaintiff's emotional impairments rendered her unable to perform even unskilled work. (Tr. 663).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) post closed head injury; (2) cervical degenerative spine; (3) degenerative changes and impingement of the right shoulder; (4) trapezius strain; (5) essential tremor; (6) chronic pain; (7) post carpal tunnel surgeries; (8) obesity; and (9) depression, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 28-30).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following restrictions: (1) she can lift 20 pounds occasionally and 10 pounds frequently, but can lift no more than 10 pounds with her right upper extremity; (2) she can stand/walk 6 hours during an 8-hour workday; (3) she can sit for 6 hours during an 8-hour workday; (4) she requires a sit/stand option; (5) she can perform "less than frequent" stooping, balancing, crouching, kneeling, and rotation of the neck; (6) she cannot crawl, perform overhead work or perform constant fingering/gripping activities; (7) she must avoid concentrated exposure to extreme cold, vibration, and hazards such as unprotected heights and dangerous moving machinery; (8) she is limited to unskilled work/tasks that can be learned in 30 days or less; and (9) she is limited to jobs that impose "less than frequent" changes in work environment or work expectations. (Tr. 30).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to

question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert. As discussed below, the ALJ, based upon the testimony of the vocational expert, concluded that Plaintiff was not entitled to disability benefits.

**I.      The ALJ's Step V Determination is Supported by Substantial Evidence**

The vocational expert testified that there existed approximately 3,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 72-75). Finding that this represented a significant number of jobs, the ALJ concluded that Plaintiff was not entitled to disability benefits. Plaintiff asserts that she is entitled to relief because this does not represent a significant number of jobs. The Court disagrees.

The ALJ satisfies her burden at this final step of the analysis by establishing by substantial evidence that there exists in the national economy a significant number of jobs which Plaintiff could perform, her limitations notwithstanding. The Social Security regulations provide that this standard is satisfied when work "exists in significant numbers either in the region where [the claimant] lives or in several other regions of the country." 20 C.F.R. § 404.1566. As courts

recognize, however, "[t]here is no bright line boundary separating a 'significant number' from insignificant numbers of jobs." *Howard v. Astrue*, 2012 WL 4753364 at *8 (N.D. Ohio, Oct. 4, 2012) (quoting *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)). Instead, "[w]hat constitutes a significant number of jobs is to be determined on a case-by-case basis" taking into consideration several factors including: (1) the nature and extent of the claimant's disability; (2) the reliability of the vocational expert's testimony; (3) the reliability of the claimant's testimony; (4) the distance claimant is capable of traveling to perform the jobs in question; and (5) the types and availability of such work. *Anderson v. Astrue*, 2012 WL 7110362 at *5 (N.D. Ohio, Dec. 17, 2012) (quoting *Hall*, 837 F.2d at 275). As the *Hall* court further observed, this determination "should ultimately be left to the trial judge's [i.e., the ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall*, 837 F.2d at 275.

While the number of jobs identified by the vocational expert in this matter appears low, there is ample authority that such can constitute a significant number of jobs. *See, e.g.*, *Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (evidence that there existed 2500 jobs "within the local region" represents a significant number); *Hall*, 837 F.2d at 274-75 (evidence that there existed 1350-1800 jobs "in the region" of the claimant's residence represents a significant number). Plaintiff has failed to demonstrate that the ALJ's consideration of the aforementioned factors was improper or that her determination was not supported by substantial evidence. Accordingly, this argument is rejected.

**II.      The ALJ's Rationale for Discounting Dr. Lemke's Opinion is Not Supported by Substantial Evidence**

As noted above, Dr. Lemke, one of Plaintiff's treating physicians, offered the opinion that Plaintiff was impaired to extent greater than recognized by the ALJ. Specifically, Dr. Lemke opined that Plaintiff could occasionally lift/carry less than 10 pounds, but could never lift/carry more than 10 pounds. The doctor also reported that Plaintiff could stand/walk for less than 2 hours during an 8-hour workday. Dr. Lemke further reported that Plaintiff was "totally unable" to work "eight hours a day, five days a week, week after week." The ALJ, however, discounted Dr. Lemke's opinions. Plaintiff argues that she is entitled to relief because the ALJ failed to articulate sufficient reasons for affording less that controlling weight to Dr. Lemke's opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial

medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to her assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir.

2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

To the extent that Dr. Lemke simply opined that Plaintiff was unable to work, the ALJ properly rejected such opinions as whether Plaintiff is disabled is a matter reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1). With respect to Dr. Lemke's opinion that Plaintiff could lift less weight and stand for shorter periods of time than the ALJ concluded, the ALJ rejected such on the following basis:

> I give little weight to Dr. Lemke's opinion, as Dr. Lemke's opinion is conclusory, providing very little explanation of the evidence relied on in forming that opinion. Also, the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly as limited as the doctor has reported.

(Tr. 36).

This conclusory statement, however, fails to satisfy the relevant legal standard. As the Sixth Circuit has made clear, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, she must adequately articulate her rationale for doing so. *See Wilson*, 378 F.3d at 544-47. As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case

15

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely...To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

The ALJ has failed to provide *specific* reasons for her assessment of the doctor's opinions. Because the ALJ failed to articulate any specific rationale or, more importantly, identify any specific items in the record to support her conclusion, the Court simply cannot assess whether the ALJ's assessment is supported by substantial evidence. While the Court (or Defendant) may be able to identify portions of the record that support the ALJ's assessment, the Court cannot find that the ALJ's conclusion is legally sufficient based upon such after-the-fact rationalizations. Instead, as *Wilson* makes clear, the task of articulating the rationale for discounting a treating physician's opinion rests with the ALJ. In sum, the ALJ failed to articulate sufficient reasons for discounting Dr. Lemke's opinion. In light of the fact that Dr. Lemke's opinion is inconsistent with the ALJ's RFC determination, the ALJ's failure is not harmless. The ALJ's failure clearly violates the principle articulated in *Wilson* and renders her decision legally deficient.

**III.     Remand is Appropriate**

As discussed immediately above, the ALJ's decision in this matter is not supported by substantial evidence. While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision is not supported by substantial evidence, there does not exist *compelling* evidence that Plaintiff is disabled. In sum, evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The Court concludes, therefore, that the Commissioner's decision must be reversed and this matter remanded for further factual findings.

**CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and the matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.


Date: March 24, 2014                              /s/ Ellen S. Carmody
                                                  ELLEN S. CARMODY
                                                  United States Magistrate Judge